**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES HAUGEN AND CHRISTIAN GOLDSTON, on behalf of themselves, and all other plaintiffs similarly situated, known and unknown, | ) ) ) ) | Nᵒ. 18-cv-7297 |
| Plaintiffs, | ) ) ) | **The Honorable Elaine E. Bucklo** **District Court Judge** |
| v. | ) ) ) | The Honorable Sheila M. Finnegan Magistrate Judge |
| ROUNDY'S ILLINOIS, LLC D/B/A MARIANO'S | ) ) ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DECERTIFY FLSA COLLECTIVE ACTION**

Plaintiffs James Haugen and Christian Goldston, and the Plaintiff Class, oppose

Defendant Roundy's Illinois, LLC's Motion to Decertify FLSA Collective Action.

Defendant has failed to present sufficient evidence to decertify the FLSA Collective Action

as initially conditionally certified by this Court on December 13, 2019 Dkt. 50-51. Plaintiffs

and the Plaintiff Class hereby submit to this Court their attached Memorandum in

Opposition to Defendant's Motion to Decertify FLSA Collective Action.

## TABLE OF CONTENTS

I.    Introduction……………………………………………………………………………..1

II.   Despite the Fact Plaintiffs Clearly Challenge Defendant's Misclassification of
Their "PSM" Position as Salary Exempt, Defendant's Decertification Motion Addresses
Only A Very Narrow Set of Facts Related Exclusively to a Few Plaintiffs Who
Performed "Front End" of Store Work Such as Bagging and
Cashiering……………………………………………………………………………….2

III.  Defendant's Proffered Evidence Consisting of Scant Deposition Excerpts is Not a
Fair Representation of Plaintiffs' Testimony…………………………………………………3

      A.    Deposition Testimony of Plaintiff Dolores Garcia…………………………….5

      B.    Deposition Testimony of Plaintiff Thomas Ignoffo……………………………6

      C.    Deposition Testimony of Named Plaintiff Christian Goldston………………...6

      D.    Deposition Testimony of Plaintiff Kevin Cunningham…………………………7

      E.    Deposition Testimony of Named Plaintiff James Haugen…………………...7

      F.    Deposition Testimony of Non-Plaintiffs Hall and Nieves………………………8

IV.   Plaintiffs' Master Declaration, Attached as Exhibit A, Demonstrates the High
Degree of Similar Duties Performed by PSMs and Fills in The Gaps Left by Defendant's
Scant Discovery of Only 5 Opt-In Plaintiffs…………………………………………………...9

V.    Defendant's Standardization of the PSM Position is Clear, and That
Standardization is Significant in Satisfying the Similarity Requirements for FLSA
Certification…………………………………………………………………………………10

      A.    Defendant's Analysis is a Splitting of Hairs Regarding the Percentage of Time
PSMs Spend Performing Certain Tasks, While Avoid Any Discussion of PSM Core Job
Duties Such as Revealed in the PSM "Position Description" Universally Utilized by
Defendant…………………………………………………………………………………10

      B.    Testimony of current PSM Evette Nieves…………………………………….11

VI.   Legal Analysis at Decertification Stage…………………………………………….14

      A.    Whether the Plaintiffs Share Similar Factual and Employment Settings……15

      B.    Whether the Various Affirmative Defense Available to the Defendant Would
Have to be Individually Applied to Each Plaintiff……………………………………….16

      C.    Fairness and Procedural Concerns……………………………………………20

**VII.** **All of Defendant's Authority in Support of Decertification is Distinguishable From the Facts of this Case**……………………………………………………………..22

**VIII.** **Conclusion**………………………………………………………………..27

## **TABLE OF AUTHORITIES**

### Cases

*Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946) ................................................ 22

*Arnold v. Directv, LLC*, No. 4:10-CV-352-JAR, 2017 WL 1251033, at *2 (E.D. Mo. Mar. 31, 2017) . 14

*Benedict v. Hewlett-Packard Co.*, No. 13-CV-00119-BLF, 2016 WL 3742342, at *3 (N.D. Cal. July 13, 2016) ................................................................................................................................... 25

*Bradford v. CVS Pharmacy, Inc.*, 308 F.R.D. 696, 699 (N.D. Ga. 2015) .................................... 26

*Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 345 (N.D.Ill. 2012) ..................... 15, 26, 27

*Dailey v. Groupon*, No. 11 C 05685, 2014 U.S. Dist. LEXIS 119190, ** 19-21 (N.D. Ill. Aug. 27, 2014) ......................................................................................................................... 20, 25

*Hardesty v. Kroger Co.,* No. 1:16-CV-298, 2018 WL 4680801, at *6 (S.D. Ohio Sept. 28, 2018).......... 14

*Haschak v. Fox & Hound Rest. Grp.*, No. 10 C 8023, 2012 WL 5509617, at *3-4 (N.D. Ill. Nov. 14, 2012) ........................................................................................................................ 19, 20

*Hawkins v. Securitas Sec. Services USA, Inc.*, 280 F.R.D. 388, 396-97 (N.D.Ill. 2011) ........................ 19

*Heckler v. DK Funding*, 502 F. Supp. 2d 777, 779 (N.D. Ill. 2007) .......................................... 14

*Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) ............................................. 21

*Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101 (N.D. Ill 2013) ................................................ 22, 23, 24

*In re Motorola Sec. Litig.*,644 F.3d 511, 519 (7th Cir.2011) ................................................ 20

*In Re Wells Fargo Home Mortg. Overtime Pay Litig.,* 571 F.3d 953, 957 (9th Cir. 2009) ......................... 19

*Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015) ...................................... 21

*Kumar v. Tech Mahindra  Inc.*, No. 4:16-CV-00905-JAR, 2019 WL 1330935, at *3 (E.D. Mo. Mar. 25, 2019) ................................................................................................................... 15, 24

*Monroe v. FTS USA*, 860 F.3d 389 at 402 (6th Cir. 2017)................................................... 17, 21

*O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 576 (6th Cir.2009) ......................................... 14

*Pierce v. Wyndham Vacation Resorts, Inc.* No.3:13-cv-641-CCS, 2017 WL 4398656, at * 11 (E.D. Tenn. Oct. 3, 2017)....................................................................................................... 14

*Powers v. Hamilton Cnty. Pub. Defender Comm'n*,501 F.3d 592, 619 (6th Cir.2007) ......................... 20

*Skelton v. American Intercontinental University Online*, 382 F.Supp.2d 1068 (2005)................................ 21

*Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944) .............................. 21, 22

*White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 372 (E.D. Mo. 2014) ...................................... 15

### Statutes

29 U.S.C. §§ 251 –262 .......................................................................................... 22

Fed. R. Civ. P. 23 ................................................................................................. 17

### Regulations

C.F.R. §541.100(a)(3)........................................................................................... 17

C.F.R. §779.343 .................................................................................................. 17

## I.      **INTRODUCTION**

As reasonably summarized in Defendant's Motion, after this Court's Conditional

Certification of Plaintiffs' Fair Labor Standards Act overtime claims in December of 2019,

Court approved Notice and Consent forms were sent to all former and (at the time) current

"People Services Managers" ("PSMs") who worked at Defendant's Chicagoland locations

within the applicable statute of limitations.  After the "opt-in" process, which garnered 28[1]

opt-in Plaintiffs, discovery ensued.  Having already taken the depositions of the Named

Plaintiffs (Haugen and Goldston), Defendant selected five (5) opt-in Plaintiffs to depose,

and Plaintiffs also deposed 4 store managers as well as 2 PSMs who were still employed by

Defendant and who had submitted declarations supporting Defendant's opposition to

Plaintiffs' prior Motion for Conditional Certification.  The testimony of one the current

PSM (Ms. Nieves) is noted herein (and expounded on later in the brief) because without the

intervening lawyer skewing and even with a self-described wish to help the Company with

the initial declaration, her ultimate frank and honest deposition testimony about the

consistent, uniform core job duties of the PSM position paints a very clear picture for this

Court of the similarities across the PSM position.

---

[1] Although at the time Defendant compiled the list of PSMs for purposes of sending Notice and Consent forms all such PSMs identified were within the statute of limitations, 3 of the collective group, by the time they returned their Consents and the Consents were filed with the Court, experienced an expiration of their 3 year limitations period.  Additionally, for purposes of this memorandum, efforts to contact one PSM Plaintiff were unsuccessful.  As such, evidence presented herein is pertinent to the 2 named Plaintiffs and 24 opt-in Plaintiffs.

II.    **DESPITE THE FACT PLAINTIFFS CLEARLY CHALLENGE DEFENDANT'S MISCLASSIFICATION OF THEIR "PSM" POSITION AS SALARY EXEMPT, DEEFENDANT'S DECERTIFICATION MOTION ADDRESSES ONLY A VERY NARROW SET OF FACTS RELATED EXCLUSIVELY TO A FEW PLAINTIFFS WHO PERFORMED "FRONT END" OF STORE WORK SUCH AS BAGGING AND CASHIERING**

As mentioned throughout Plaintiffs' Memorandum in Opposition, *infra*, Defendant dedicates a substantial portion of its brief discussing differences in estimates regarding the percentage of time the spent performing "non-PSM" duties – mostly bagging and cashiering – by the Named Plaintiffs and a handful of opt-in Plaintiffs. However, throughout its presentation, Defendant completely glosses over Plaintiffs' allegations that they were, and are, misclassified as salary-exempt due to the substantial degree by which Defendant and its management employees controlled and continue to control all aspects of decision-making and judgment as that important factor relates to the propriety of Plaintiffs' collective status.

While true and relevant that Plaintiffs allege in their First Amended Complaint they "performed significant hours of non-exempt manual labor and other non-exempt duties", such that PSMs were improperly classified as exempt (as confirmed through the testimony of both Named Plaintiffs and opt-in Plaintiffs Ignoffo, Cunningham and by the remaining opt-in Plaintiffs via the Master Declaration, discussed, *infra*), Plaintiffs also allege that PSMs are misclassified due to the "job duties and reporting structures of Plaintiffs" and the degree to which they "worked under the constant and exclusive direction of Defendant's management employees." Dkt. 38, ¶¶ 12, 14, 15.[2] Defendant's failure to either rebut, address or even acknowledge the substantial similarities in the PSMs' experiences with regard to their inability to exercise independent discretion and judgment as to matters of

---

[2] Defendants denied the seminal portions of these allegations in their Answer to Plaintiffs' First Amended Complaint. Dkt. 42, ¶¶. 12, 14, 15.

significance due to the control exerted by Defendant's rigid corporate structure and managerial oversight and instead focus on nuanced differences of percentages of time bagging groceries, is telling.

### III. DEFENDANT'S PROFFERED EVIDENCE CONSISTING OF SCANT DEPOSITION EXCERPTS IS NOT A FAIR REPRESENTATION OF PLAINTIFFS' TESTIMONY

Defendant selected 5 opt-in Plaintiffs to depose, obviously with an eye towards its ultimate pursuit of this decertification motion. Looking to capitalize on potentially slight difference between the 44 grocery stores it operates in the Chicagoland area (differences associated primarily with the turnover of employees and the store's resulting hiring needs), it can be expected Defendant selected 5 opt-ins who worked as PSMs at as diverse of store locations as possible so as to exploit even the slightest differences in PSM job duties. While a crafty decertification strategy, it is important to note at the outset that Defendant's analysis of 5 of the 24 PSM opt-ins presents the Court with a comparison only a little more than 20% of the opt-in field, and that 20% was cherry-picked at Defendant's discretion.[3]

Defendant deposed the following 5 opt-in Plaintiffs: Dolores Garcia, Janel Larson, Kevin Cunningham, Ruba Al Ayed, and Thomas Ignoffo. Along with the 2 named Plaintiffs, Haugen and Goldston, Defendant presents to this Court just 7 examples of PSM duties and activities in support of its argument that this group of Plaintiffs are so sufficiently dissimilar so as to support decertification. Notably, the attention Defendant gives to the testimony of Larsen, Ayed, Goldston, and Cunningham in its motion is quite minimal,

---

[3] Defendant's skewed cherry-picking in that regard is remedied by way of Plaintiffs' Master Declaration, attached as **Exhibit A** and discussed *infra,* wherein 26 PSMs attest to a plethora of core job duties.

relying most heavily on the comparative experiences of just 3 PSMs: Haugen, Garcia and Ignoffo.

As will be illustrated *infra*, Defendant created the PSM position to fill a low level human resources role at all its commonly modeled 44 Chicagoland stores. This largely homogenized PSM position was assigned the identical "salary exempt" classification, and there is absolutely no evidence in the record that Defendant has ever, in any way, distinguished between any store or any PSM position relevant to job duties – at least not until challenged by this litigation. After having taken advantage of utilizing a cookie cutter, static position that helped streamline their successful grocery store model and enhance profits, Defendant takes a new approach and argues to this Court, on the basis of just 20% of the overall universe of PSM-plaintiffs during the relevant time period, that the evidence provided by its tiny sampling is sufficient to support decertification of this collective group.

A close look at the thin ice upon which Defendant rests its decertification argument reveals that Haugen, Garcia and Ignoffo do indeed offer some modestly different views of what they did on a day to day basis as a PSM working in different stores that operated under Defendant's model. After soliciting guesses from a few of the deposed PSMs, Defendant focuses almost exclusively upon the "percentage" of time those few PSMs spent performing non-PSM duties, mostly bagging and cashiering.

Defendant focuses, in Section III (1) of its brief, on some of the limited differences in the testimony of the PSMs identified above and summarizes at page 6 that "the duties that they performed differed drastically" and that even with similar job duties, there were "dramatic differences in how they performed those duties."

4

Understanding advocacy in the law, one still struggles to appreciate how the differences in time spent on certain minor job duties, as elicited under cross examination, proves that PSM job duties across the board can be described as "drastic" and "dramatic" differences. They are not. Additionally, Defendant seems to assume in its argument that varied micro evidence, limited to only issues such as "whether, and how often, Plaintiffs are allegedly 'called away' from their duties to perform non-PSM work" is the death knell to this collective action. It is not. As argued *infra*, the standard by which certification of a collective action is evaluated paints with a much broader stroke, and the asserted mini-differences elicited by Defendant in deposition testimony are insufficient to support decertification.

### A. Deposition Testimony of Plaintiff Dolores Garcia

Defendant relies heavily upon the assertion that deposition testimony revealed significant differences in job duties as related to "front end" of the store duties such as bagging or cashiering.[4] At page 6 of its brief, Defendant alleges Garcia testified she never performed front end duties, and footnotes pages 79-86 of Garcia's deposition as support for that description. However, a fair review of those pages of Garcia's testimony fails to reveal Garcia ever saying that. Indeed, after defense counsel acknowledged that he was asking for mere "averages" and "rough estimates", nowhere in his questioning of Garcia does he ever ask directly about front-end duties, and Garcia never directly testifies about front-end duties. The nearest defense counsel gets to asking Garcia about front-end job duties is the question and answer at page 86:12-15, where Garcia says that she "believes" she has covered all of

---

[4] References to the deposition excerpts submitted by Defendant are contained in Plaintiffs' brief as "[Name] Dep. Pg: line number". Plaintiffs have also submitted the entire deposition transcript of Evette Nieves, and those references are in the same format.

her *main* job duties. It is a stretch to assert to the Court, based upon that that testimony, a conclusion that Garcia *never* performed front-end store duties.

## B. Deposition Testimony of Plaintiff Thomas Ignoffo

Next, in Section III, Defendant clearly crosses the chalk line of disingenuous when it describes Plaintiff Ignoffo's testimony, at the bottom of page 6 of its brief, as establishing Ignoffo spent "50-70%" of his time on front end duties. Clearly, at p. 47 of his deposition, Ignoffo was referring to "holidays and weekends" in his answer. Even more clearly, in the questions asked on lines 1-11 of p. 47, defense counsel embedded within his own question the premise of front-end work during holidays and weekends. As Ignoffo was pushed in that regard (despite *twice* saying he "couldn't really give an accurate percentage for like a normal day because it depended on the days", Ignoffo dep at 48:13-21), defense counsel led Ignoffo into finally guessing at about 3.5 to 4.5 hours a day helping at the front end of the store. Ignoffo Dep. at 49;1-5. Clearly, Ignoffo never said he spent 50-70% of his time performing front end of the store duties.

## C. Deposition Testimony of Named Plaintiff Christian Goldston

With respect to Plaintiff Goldston, Defendant again takes questionable liberty in describing what was actually said in the deposition. Defendant, at top of page 7 of its brief, generically says Goldston testified to spending 40% of his time doing front-end work, but the question that finally drew Goldston's estimate of 40% was a completely different question. At Goldston Dep. 28:15 – 29:8, the question and answer are clarified to indicate that the 40% estimate was in regard to "south Loop" and "all lumped together" to be about 40%. But other qualifying information was included in Goldston's answer, information Defendant fails to reveal to the Court. Goldston's testimony also established that the time

doing front-end duties was less than 40% under store manager Meagan Gleeson. Goldston Dep. at 30:22 – 31:3. And, Goldston testified he worked at another store (Oak Lawn, see pg. 25:18-23) that is specifically excluded from the questioning about the south Loop store that Defendant presents to the Court.

### D.  Deposition Testimony of Plaintiff Kevin Cunningham

Defendant also deposed a former PSM named Kevin Cunningham and presented just a sliver of his testimony in support of the asserted differences in PSM duties.  And, again, Defendant's description of Cunningham's testimony is out of context and appears to be an attempt to mislead the Court.  First, at the start of counsel's press to come up with a number, Cunningham tries to explain that it would be "hard to describe" (Cunningham Dep at 33:4), and "I would have to guess on that" (Cunningham Dep at 34:8 and again at 34:14). Finally, after establishing that his answers were guesses, Cunningham does venture a guess that "if all was well in the world, you know, I could be doing, you know, roughly 60 percent . . . and things were frequently not perfect.  So it's hard to say." Cunningham Dep. at 34:11-16.  This is hardly the testimony Defendant elected to describe to the Court as a sure "40%" of non-PSM duties and in any event, is not testimony even germane to decertification.

### E.  Deposition Testimony of Named Plaintiff James Haugen

Giving some credit where credit is due, Defendant does, finally, describe Plaintiff Haugen's testimony fairly, in that Haugen testified as having performed front-end work (i.e., "non-conventional PSM functions") 10-20% of the time. Haugen Dep. at 41:3-50. However, this standalone accurate description out of just 5 PSMs does not meet the standard for decertification because the testimony falls far short of destroying the similarities between the

collective group that has always supported this action on the collective platform provided by the FLSA.

### F. Deposition Testimony of Non-Plaintiffs Hall and Nieves

With such slim pickings from which to evidence any appreciable disparity between PSM duties, Defendant goes on to rely upon two current employees for further support, employees who were interviewed by defense counsel early in the case at their store locations and who ultimately elected not to join the case with their co-PSMs.[5] Defendant offered the declarations of Evette Nieves and Rachel Hall, harvested from those initial on-site interviews, in an attempt to further illustrate disparity among PSM duties and tasks. In that respect, Defendant touts the fact that Hall's declaration establishes she has never spent "significant" amounts of time doing cashier or other non-PSM work and says that although she does spend some parts of her day giving "cashier assistance", the "vast majority of [her] time" is spent on described PSM duties (i.e., the duties Plaintiffs allege are so regimented and dictated by Company policy, that they fail to satisfy the claimed salary exemption). But unlike the specificity defense counsel attempted (but failed) to achieve in the deposition examination of Plaintiff PSMs, Hall's affidavit falls far short of defining or attempting to quantify what "significant" or "vast majority" means. Hall's non-specific references to her frequency of non-PSM duties is of no help to Defendant's decertification arguments, especially in light of the fact that Defendant collected little or no dependable certainties in the deposition testimony of the 5 Plaintiffs, as analyzed above.

---

[5] A normal occurrence in FLSA collective actions, where current employees must take affirmative steps by "opting-in" to a case (as opposed to being automatically included in a Fed. R. Civ. P. 23 Class Definition), often current employees elect not to "rock" the employer boat. Here, both Hall and Nieves had been interviewed by the Company's attorney at the outset of the case, and evidently were reluctant to participate for their own reasons.

The declaration of Ms. Nieves is also unhelpful to Defendant's cause. While more about Ms. Nieves' deposition testimony is discussed below, suffice it to say that her declaration merely says she performed "almost no tasks that were not part of her normal PSM duties" (again, those are the very duties Plaintiffs allege do not meet the requirements of a salary exemption), but the declaration fails to describe much at all about what "normal PSM duties" consist of. Instead of presenting percentages, as the deposed Plaintiff PSMs were pressed to provide, Defendant lets rest the simple and vague reference to "normal PSM duties".

Taken in the aggregate, Defendant's proffered evidence does little to dispel the notion that this homogenized, regimented, and standardized PSM position, replicated within its successful grocery store model in each one of its 44 Chicagoland stores, is proper for collective treatment going forward.

## IV. PLAINTIFFS' MASTER DECLARATION, ATTACHED AS EXHIBIT A, DEMONSTRATES THE HIGH DEGREE OF SIMILAR DUTIES PERFORMED BY PSMs AND FILLS IN THE GAPS LEFT BY DEFENDANT'S SCANT DISCOVERY OF ONLY 5 OPT-IN PLAINTIFFS

In its decertification Motion, Defendant elects to hang its hat on trivial differences between just 5 opt-in Plaintiffs and the 2 Named Plaintiffs, apparently hoping the Court will ignore the fact that 19 other PSM Plaintiffs are part of this case. Aside from the very minor differences Defendant attempts to turn into decertification, additional evidence (evidence Defendant elected not to pursue in discovery), establishes that this standardized PSM position satisfies the requirements for FLSA collective treatment necessary at this stage of scrutiny.

Attached as **Exhibit A** is the collective, Master Declaration of 26 Plaintiff PSMs that summarizes the core set of duties each of them performed while working as a PSM. This

collective declaration dispels any confusion Defendant may have created with its narrow, cherry-picked deposition testimony which, as summarized herein, also often embellishes that testimony. The Master Declaration is further evidence that the PSMs who opted-in to this case performed core duties, dictated by Company policies, procedures, documents, and other homogenized processes that were so identical, the Company was capable of scoring PSM performance on a common "Scorecard" or matrix, as described in the Master Declaration and testified to by Ms. Nieves (described *infra*). The slight differences in some duties, as described by Defendant in its presentation, is put into perspective by comparison to the comprehensive description of 26 Plaintiff PSMs and their vast range of nearly identical duties, all as described in the Master Declaration.

## V. DEFENDANT'S STANDARDIZATION OF THE PSM POSITION IS CLEAR, AND THAT STANDARDIZATION IS SIGNIFICANT IN SATISFYING THE SIMILARITY REQUIREMENTS FOR FLSA CERTIFICATION

### A. Defendant's Analysis Is a Splitting of Hairs Regarding the Percentage of Time PSMs Spend Performing Certain Tasks, While Avoiding Any Discussion of PSM Core Job Duties Such as Revealed in the PSM "Position Description" Universally Utilized by Defendant

Defendant's choice to focus on miniscule differences in PSM functions, and the argument that those tiny differences are sufficient to destroy this Court's previous granting of collective treatment of these near identical claims, ignores other facts that establish the many similarities necessary to support proceeding collectively.

This PSM position, as would be expected in a uniform, regional retail store model of 44 near identical locations, is highly controlled by corporate rules. As established by the Master Declaration referenced above, all locations, and all PSMs, utilized identical documents, policies, procedures, and forms. Although there is ample evidence of this

standardized store position, perhaps most revealing is the PSM "Position Description" (Doc. 40-3 and attached hereto as **Exhibit B**) that Defendant used on a company-wide basis for this misclassification of employees as salary exempt.

Defendant seeks out, recruits, hires, onboards and then employs all PSMs under the PSM Position Description. In it, there is no reference to any variances in job duties depending on the hiring location or what store manager inevitably controls the PSM's workday. The description is void of any caveats or references to adjustments or a reallocation of the time required for particular functions depending on a store location or a store manager. The Position Description is "the" document utilized by Defendant to seek out, hire and then staff the PSM position companywide. The distance Defendant now seeks to create from that telling document would suggest the Company is being less than truthful to candidates interviewing for the PSM position and, if Defendant's presentation in its quest to decertify is to be believed, Defendant apparently hires PSMs under the false guise of the Position Description and then simply places the PSMs at one of the 44 local stores to perform a myriad of unrelated duties not previously disclosed. Certainly, Defendant would not have the successful, high end grocery store chain model it does with such a cavalier approach to job descriptions and the candidates to whom they describe job duties at the time of hire. The Position Description provides solid evidence that the PSM position is significantly robotic from store to store, and Defendant has provided very little evidence to the contrary.

### B. Testimony of Current PSM Evette Nieves

Additional, telling evidence of the standardization of the PSM position was provided by a current PSM, Ms. Evette Nieves (deposition attached hereto as **Exhibit C**) who, in

11

cooperation with Defendant, had submitted a declaration at the conditional certification stage of the case. At the time of her deposition, Nieves had been an employee with Defendant for nearly 10 years. Nieves Dep. at 15:17-21. Nieves first took a PSM position with Defendant in September of 2015 at the Elston location. Nieves Dep. at 21:7-10. At the time of her deposition, Nieves held the PSM position at the Bucktown location. Nieves Dep. 24:15-17. At some point right before her transition from Elston to Bucktown, a lawyer representing Defendant came to the store to interview Nieves about her experiences as a PSM. Nieves Dep at 34:8-25, 35:1-15. In cooperating with the Company's attorneys and signing the declaration, Nieves was aware that her actions would benefit the Company. Nieves Dep. at 39:1-18. It was Nieves' desire to help the Company because she loves her job. Nieves Dep. at 40:9-25, 41:1-4.

Despite this admirable allegiance to the Company, just as admirable was Nieves' remarkably candid testimony in terms of the significant standardization of the PSM position within Defendant's retail model. In regard to her PSM training responsibilities, Nieves conceded that "there was a company process. Yes". Nieves Dep. at 47:14-25. All of the training requirements that Nieves carries out for new employees are dictated by the Company's process. Nieves Dep at 49:9-18, 67:2-12. Nieves testified that training was a huge part of a PSM's job, and that it was important that she and all the PSMs follow the Company procedures in that regard and that the Company requirements were the same from store to store. Nieves Dep. 67:13-19.

Additionally, Nieves testified about the Company's standardized "metrics" that were put in place around 2018, metrics that are applied to all PSMs. Nieves Dep at 53:15-21. Nieves spoke of the metrics as applying to "we", i.e., the entire roster of PSMs across the

12

Company. Nieves Dep. at 65: 7-25, (compare to Master Declaration regarding PSM "metrics", and the PSM Scorecard addressed *infra*). Also, consistent with the Master Declaration, Nieves testified about the "interview packet" dictated to all PSMs by the Company. Nieves Dep at 76:7-12, 78:14-19. Nieves commented on the requirement for PSMs to follow "all company and department policies and procedures". Nieves Dep at 110:7-25. Nieves summarized that following Company policies and procedures, including using the interview packet, the 30/60/90 check-in requirements, and all the standardized training material and process, were all PSM duties dictated by Company rules. Nieves Dep. at 112:1-24. Additionally, Nieves testified that "from my understanding, the policy – policies and procedures, we are union contracted. So therefore, we have to follow the union contract. So if – as managers, overall, you know, we gotta [follow] the guidelines." Nieves Dep at 111: 2-6. Continuing, she testified "I can't pick and choose, right, because we are union contracted. Nieves Dep. at 111:10-11. In fact, Nieves conveniently summarized her overall deposition testimony as follows:

> **Q**: Based upon what we have been talking about here for the last couple of hours, is it fair to say that a large portion of your job as a PSM is dictated by those Mariano company policies and procedures?
>
> **A:** As a PSM, I would say yes.

Nieves Dep, at 112:25 – 113:1-4.

Defendant has, purposefully and successfully, created one of the most powerful high end grocery store chains in the country. Within their model of success is store to store replication of proven policies and procedures. The PSM position is just one of many successful replications throughout the 44 Chicagoland stores. Strapped with that inescapable element in its quest for decertification, Defendant focuses on minor differences between a

13

mere handful of the PSMs. Even if 3 or 4 out of the 26 Plaintiff PSMs cashiered, bagged groceries, helped out in other departments for 10%, 40% or some other unknown percentage of time (Defendant's embellishment of testimony in that regard casts doubt on whether any of that is even true), that does not avert the legal analysis supporting this collective action as appropriate certified.

## VI.   <u>LEGAL ANALYSIS AT DECERTIFICATION STAGE</u>

Plaintiffs do not quarrel with Defendant's assertion of the standard upon which the Court must evaluate "similarly situated" at the decertification stage. At this stage, this Court must consider, "based on any additional evidence . . . whether there is sufficient similarity . . . to allow the matter to proceed to trial on a collective basis." *Heckler v. DK Funding*, 502 F. Supp. 2d 777, 779 (N.D. Ill. 2007). However, largely skipped over in Defendant's brief is the requirement that this analysis be conducted under a far less stringent standard than a similar question under the strict mandates of Fed. R. Civ. P. 23 Class requirements. See *Hardesty v. Kroger Co.,* No. 1:16-CV-298, 2018 WL 4680801, at *6 (S.D. Ohio Sept. 28, 2018), citing *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 576 (6th Cir.2009). As has been decided throughout the circuits, plaintiffs are similarly situated for purposes of the FLSA when "their claims [are] unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct. *Id.*, *Pierce v. Wyndham Vacation Resorts, Inc.* No.3:13-cv-641-CCS, 2017 WL 4398656, at * 11 (E.D. Tenn. Oct. 3, 2017). Similarly situated "does not necessarily mean identical." *Arnold v. Directv, LLC*, No. 4:10-CV-352-JAR, 2017 WL 1251033, at *2 (E.D. Mo. Mar. 31, 2017). "[T]he question is simply whether the differences among the plaintiffs outweigh the similarities of the practices to which they were allegedly subjected." *White v. 14051*

14

*Manchester Inc.*, 301 F.R.D. 368, 372 (E.D. Mo. 2014) (quoting *Baptist Mem'l.*, 2011 WL

1883959, at *4), *Kumar v. Tech Mahindra Inc.*, No. 4:16-CV-00905-JAR, 2019 WL 1330935,

at *3 (E.D. Mo. Mar. 25, 2019).

Defendant ignores this significant distinction, fails to bring to the Court's attention

various opinions recognizing the distinction, and argues throughout its Motion that just a

few of the collective Plaintiffs herein are not "similarly situated" (the FLSA standard) to the

rest of the collective group because "individual questions" predominate. While Defendant

does, at least, in its opening comments proffer the correct legal standard and the 3 pertinent

factors involved in FLSA decertification (addressed more thoroughly *infra*), Defendant

largely cloaks its FLSA decertification arguments in Fed. R. Civ. P. 23 clothing. Once

analyzed under the proper FLSA standard, from start to finish, it becomes evident that

Defendant has produced nothing worthy of persuading this Court from its original decision

to conditionally certify the case as a collective action under the FLSA.

As mentioned above, the Seventh Circuit has applied a three-factor test to determine

whether Plaintiffs are similarly situated. *Camilotes v. Resurrection Health Care Corp.*, 286

F.R.D. 339, 345 (N.D.Ill. 2012). Specifically, the Court is to analyze (1) whether the

plaintiffs share similar factual and employment settings, (2) whether the various affirmative

defenses available to the defendant would have to be individually applied to each Plaintiff,

and (3) fairness and procedural concerns.

### A. Whether the Plaintiffs Share Similar Factual and Employment Settings

As illustrated in the exhaustive analysis *supra*, the factual and employment settings of

the Plaintiff PSMs in this case are nearly identical, even though they need not be identical to

defeat Defendant's attempt to decertify. This factor weighs squarely in favor of certification.

The PSM job title is identical. Their job description is identical. Their hours and their shifts are identical. With at best modest variances on the amount of time spent on a few discrete job duties, their core job duties are identical. Their job duties are driven, dictated and measured by rigorous corporate policies and procedures, including a companywide PSM scorecard or "matrix" measuring performance. These common elements control everything from the questions the PSM must ask in an initial interview process, the training given to each and every employee, the 30/60/90 day reviews, and the uniform PSM Scorecard matrix. And, as concluded by one of Defendant's most loyal current PSMs (Ms. Nieves), a large portion of PSM job duties is dictated by those Company policies and procedures and union affiliation. The factual and employment settings for this collective group of PSMs are nearly identical and satisfy the first of the three-prong test.

**B. Whether the Various Affirmative Defenses Available to the Defendant Would Have to be Individually Applied to Each Plaintiff**

As clearly established in the context of FLSA certification and decertification, and even in the world of the more stringent Fed. R. Civ. P. 23 analysis, the different defenses to which these PSMs may be subject is not a significant roadblock to this case moving forward on a collective platform.

First, a triggering factor to this analysis, in order to fall Defendant's way, would require there to be "various" affirmative defenses. Here, that factor fails at the outset. Defendant has but one applicable defense supported by record in this matter, the administrative exemption, and that is the only defense with which Defendant will toil at trial.[6]

---

[6] While Defendant proffers three exemption defenses in its Answer to Plaintiffs' First Amended Complaint (See Dkt. 42, pg. 15-16), only one of those exemption defenses is supported by the evidence and testimony in the record, as the executive exemption defense (and by extension, the combination exemption set forth in by

Moreover, to properly apply this analysis, it must be emphasized that "[S]imilarly situated" does not mean that the plaintiffs must be "identically situated." *Monroe v. FTS USA*, 860 F.3d 389 at 402 (6th Cir. 2017). Instead, as the *Monroe* court reasoned:

> . . . plaintiffs do not have to be 'identically situated' to be similarly situated, and the FLSA is a remedial statute that should be broadly construed. 2 ABA Section of Labor & Emp't Law, supra, at 19-150, 19-166 (compiling cases).

*Id.* at 402

Defendant argues Plaintiffs have disparate factual and employment settings and there is no "common practice to be put on trial here." See Defendant's Memo, p. 8. In proffering this argument, Defendant focuses solely on limited, discrete day to day job duties, an approach that has been rejected by courts as too stringent in the analysis of FLSA collective actions. While many courts have held that the "commonality" requirement for Fed. R. Civ. P. 23 cases is not met when there are factual differences among class members that could affect the application of exemptions relevant to overtime law misclassification cases, courts analyzing the FLSA "similarly situated" standard have been far more accommodating because the established hurdle is lower. Couched in the proper, three-part analysis for collective action treatment under the FLSA, employer decertification motions have been routinely defeated where the plaintiffs' collective claims show similar factual and employment settings and where allowing the case to proceed as a collective action is both

---

C.F.R. §779.343), is unavailable to Defendant. Pursuant to C.F.R. §541.100(a)(3), an employer must show that an employee "customarily and regularly directs the work or two or more other employees" in order to prove that the employee is exempt via the executive exemption. As shown by the record, including the testimony of 7 Plaintiff PSMs, two non-plaintiff PSMs and the Position Description, which states in relevant part "[t]his job has no supervisory responsibilities" (See page 2 of the "Position Description", **Exhibit B**"), it is undisputed, and Defendant cannot show, that any PSM can satisfy the executive or combination exemptions, because the second prong related to the management of two or more other employees cannot be met.

fair and procedurally appropriate, even if the employer may have to foster more than one defense. Here, as highlighted in footnote 6 above, Defendant has but one defense to foster.

Despite the fact Defendant might need to present evidence against a handful of PSM's claims that could be marginally different from the larger majority of claims, Defendant will still be attempting to marshal the same single defense: the administrative exemption. Moreover, in its decertification motion, Defendant has identified, at best (and via embellished and out of context cherry picking of deposition excerpts) only 3 or 4 Plaintiffs' claims that merely suggest some modest differences in terms of day to day activities. Defendant provided no evidence with regard to the other 22 or so claims. Finally, with regard to the factual differences, if any, between these PSM claims, many of the decertification cases Defendant relies upon pose challenges of hundreds, or even thousands of Plaintiffs, some of which would require individual factual defenses. Indeed, in a case of this modest size, the case would not necessarily need to proceed at trial with representative testimony. Calling 26 witnesses to testify about their largely standardized job duties would not be prohibitive for Plaintiffs at trial (it is reasoned this Court has dealt with significantly larger trials). No matter how a collective action trial of these largely similar claims would proceed, this Defendant, with substantial resources and an able army of counsel, would not be prejudiced in such a proceeding.

Furthermore, in *In Re Wells Fargo Home Mortg. Overtime Pay Litig.*, even under the more stringent standard of R. Fed. R. Civ. P. 23, the Court recognized that "[A]n internal policy that treats all employees alike for exemption purposes suggests that the employer believes some degree of homogeneity exists among the employees. This undercuts later arguments that the employees are too diverse for uniform treatment." *In Re Wells Fargo*

*Home Mortg. Overtime Pay Litig.,* 571 F.3d 953, 957 (9th Cir. 2009). Thus, in the case at bar, Defendant's attempt to distance itself from the corporate decision to highly regulate every task, every duty, and every document PSMs utilized in the exercise of their jobs and, to evaluate all PSMs with the same metrics of expectations, supports certification.  Here, faced with that reality and strapped with the baggage of companywide standardization of the PSM position, Defendant takes the approach that a handful of PSMs who might have spent 10% or 40% or some other unknown percentage of time performing bagging and cashiering duties (if that is even true – Defendant's embellishment of that testimony renders it doubtful) creates such a gap of similarity that the case should be decertified.  The case law rejects Defendant's arguments in that regard.

In *Haschak v. Fox & Hound Rest. Grp.*, No. 10 C 8023, 2012 WL 5509617, at *3-4 (N.D. Ill. Nov. 14, 2012), a combined Fed. R. Civ. P. 23/FLSA certification consideration, the Court granted both motions, holding that the plaintiffs satisfied the commonality and predominance requirements by identifying a company-wide policy that applied to all employees.  In a thorough analysis, again under the more stringent confines of R. 23, the Honorable James B. Zagel held:

> Defendants do argue, however, that the predominance component is not satisfied. I disagree.  The predominating question raised by Plaintiffs' claim is whether Defendants' company-wide policy requiring employees to perform "sidework" is tantamount to requiring them to engage in an "untipped" occupation for a sub-minimum, "tipped" wage. This question can be resolved on a class-wide basis. Cf. *Hawkins v. Securitas Sec. Services USA, Inc.*, 280 F.R.D. 388, 396-97 (N.D.Ill. 2011) (predominating questions were whether plaintiffs were required to perform the challenged duties and whether time spent performing those duties was compensable under the IMWL).
>
> Defendants point to individual differences that exist with respect to which employees perform which tasks and with what degree of frequency, and assert that these individual questions will predominate over the broader question described above. . . . . . The principal issue as to liability under Plaintiffs'

19

claim, however, is not manifest in individual discretionary decisions made by managers as to which employees should perform which tasks. The principal issue is a company-wide policy mandating performance of those tasks, and whether compensation for such performance requires at least the minimum wage.

*Haschak*, at *5-6.

In fact, the implementation of company-wide management policies such as those in play here could serve as markers for defining a smaller class or subclasses. See *Dailey v. Groupon*, No. 11 C 05685, 2014 U.S. Dist. LEXIS 119190, ** 19-21 (N.D. Ill. Aug. 27, 2014). If this Court determines that there exists a narrow handful of PSMs Defendant has asserted are different than the rest of the collective class members, the Court has the discretion to narrow the class or create subclasses. See *In re Motorola Sec. Litig.*,644 F.3d 511, 519 (7th Cir.2011) ("a district court has the authority to modify a class definition at different stages in litigation" ); *Powers v. Hamilton Cnty. Pub. Defender Comm'n*,501 F.3d 592, 619 (6th Cir.2007) ("district courts have broad discretion to modify class definitions, so the district court's multiple amendments merely showed that the court took seriously its obligation to make appropriate adjustments to the class definition as the litigation progressed"). Although Plaintiffs do not here suggest a modification of the Class Definition endorsed by the Court at conditional certification is necessary under these circumstances, that tool is clearly available should the Court decide to exercise its use and task Plaintiffs with providing subclass options.

### C. Fairness and Procedural Concerns.

Proceeding as a collective action furthers several important policy goals that have been embedded in the FLSA for decades. First, the collective action "allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources."

*Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)  As the Sixth Circuit in *Monroe*

explained:

> The definition of similarly situated does not descend to such a level of
> granularity. The Supreme Court has warned against such a "narrow,
> grudging" interpretation of the FLSA and has instructed courts to remember
> its "remedial and humanitarian" purpose, as have our own cases. See *Tenn.*
> *Coal, Iron & R.R. Co.*, 321 U.S. at 597, 64 S.Ct. 698; *Keller,* 781 F.3d at 806;
> *Herman,* 308 F.3d at 585. Many FLSA cases do focus on a single action, such
> as the donning and doffing cases that the dissent's reasoning would suggest is
> the only situation where representative proof would work. But neither the
> statutory language nor the purposes of FLSA collective actions require a
> violating policy to be implemented by a singular method. [ . . .] Such a
> narrow interpretation snubs the purpose of FLSA collective actions.

*Monroe*, at 402.

Here, the degree of fairness and the procedural impact of proceeding collectively also

supports certification. This case squarely satisfies the policy behind FLSA collective actions

and the remedial intent of Congress to allow an avenue for consolidating small, related

claims of employees for which proceeding individually would be too costly to be practical.

Because all PSMs allege a common, single FLSA-violating policy (misclassification under

the administrative exemption), "[t]he judicial system benefits by efficient resolution in one

proceeding of common issues of law and fact." *Hoffmann-La Roche, Inc.*, 493 U.S. at 170.

Courts have recognized that "Congress passed the FLSA with broad remedial intent"

to address "unfair method[s] of competition in commerce" that cause "labor conditions

detrimental to the maintenance of the minimum standard of living necessary for health,

efficiency, and general well-being of workers." *Keller v. Miri Microsystems LLC*, 781 F.3d 799,

806 (6th Cir. 2015).  The provisions of the statute are "remedial and humanitarian in

purpose," and "must not be interpreted or applied in a narrow, grudging manner." See

*Skelton v. American Intercontinental University Online*, 382 F.Supp.2d 1068 (2005), quoting

*Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946), *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944).  See also, Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251 –262.

Recognizing the remedial nature of the FLSA collective platform, as compared to the thin concerns brought to light by Defendant herein, the Court should find this third-prong of the 3-prong test to be one that heavily favors denial of decertification.

### VII.  ALL OF DEFENDANT'S AUTHORITY IN SUPPORT OF DECERTIFICATION IS DISTINQUISHABLE FROM THE FACTS OF THIS CASE

At page 14 of Defendant's brief, a list of 5 cases is casually referred to in support of decertification, without any real substantive discussion of the factual aspects of those cases (except the *Hundt* case, which is also distinguishable (see below)). This broad brush painting approach is illustrative of Defendant's strategy to generally ignore all of the static, generic and duplicative elements of this PSM job position as it was commonly deployed from store to store and create the inaccurate picture that even though the PSM position was subject to the same job description, the same performance evaluations, and largely the same core job duties and functions, it is nevertheless subject to decertification.  A closer look at the facts of these cases evidence clear distinctions from the case at bar.

In *Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101 (N.D. Ill 2013), plaintiff sued DirectSAT for improperly classifying him as an exempt employee and failing to pay overtime. The Court conditionally certified a class for collective action that included plaintiffs that worked for DirectSAT "in various capacities, including as warehouse manager, warehouse supervisor, project manager, field supervisor, or service/installation manager." *Hundt* at 103. Plaintiffs from each of those job titles alleged that they were

misclassified because they performed substantial non-exempt duties (i.e., manual warehouse labor), did not customarily and regularly supervise other employees, or otherwise perform any executive or administrative duties. *Id*. The Defendant company asserted multiple affirmative defenses, including that the members of the *Hundt* class were properly classified as exempt under the administrative exemption, the executive exemption, or a combination exemption. *Id*. While the Court ultimately ruled in favor of DirectSAT and decertified the class comprised of different types of warehouse managers, the *Hundt* case is in fact clearly distinguishable from this case.

The class in *Hundt* was far more expansive and diverse as to job titles and positions than this PSM Class. As stated *supra*, the plaintiff class in *Hundt* was comprised of multiple exempt job titles including "warehouse manager, warehouse supervisor, project manager, field supervisor, or service/installation manager." *Hundt* at 103. These job positions, while all paid on a salary basis, performed different jobs with different duties, managerial responsibilities and expectations. The *Hundt* court recognized these distinctions when evaluating whether decertification was appropriate and noted:

> warehouse managers were expected to '[m]anage full time and temporary warehouse staff … receiving and stocking of products … precise picking and sign out of products on a[n] accurately and timely basis.' Meanwhile, warehouse supervisors were expected to 'manag[e] cycle counts and daily stock reports … [o]versee[ ] receiving and stocking of products … oversee[ ] the filling of requisitions, work orders, or requests for materials, tools, or other stock items … and to "maintain [ ] inventory records.' … In addition, some of the opt-in plaintiffs have described job duties that include management responsibilities. For instance, [two plaintiffs] both testified that they supervised at least two other employees.

*Hundt* at 107.

The *Hundt* court found that these differences in both job duties and managerial responsibilities to be instrumental in whether the Court could determine the primary duties

23

of the *Hundt* plaintiffs and whether DirectSAT's defenses could be applied uniformly. See generally, *Hundt* at 105-107. Compare to the Named Plaintiffs and opt-ins here, where it is undisputed (and detailed *supra*) that all Plaintiffs were PSMs with largely identical job duties. In that respect alone, *Hundt* is easily distinguishable. Because *multiple defenses* were proper and applicable based on the record, the Court found that these two differences could not be "applied across the board to plaintiffs' claims and potential plaintiffs' claims because "disparate defenses could be raised". *Hundt* at 105. Again, as discussed *supra* in Footnote 6, Defendant has but one proper exemption defense supported by the record.

Additionally, Defendant string-cites to other cases inapposite to the circumstances of this case. Similar to the *Hundt* case, Defendant's citation of *Kumar v. Tech Mahindra (Americas) Inc.* is a misplaced comparison. In *Kumar*, the final opt-in class was comprised of "forty-seven members … [that] worked in fifteen states holding eight different job titles" whereas, again, the collective class presented here is comprised of one job title, PSM, that was uniformly staffed at all stores within the Northern District of Illinois and subject to the same general parameters. See *Kumar v. Tech Mahindra (Americas) Inc.*, No. 4:16-CV-00905-JAR, 2019 WL 1330935, at *3 (E.D. Mo. Mar. 25, 2019). The *Kumar* court also noted that the plaintiff class members worked for "…fifteen different customers, on at least 120 individual projects." *Id*. The scope of the *Kumar* class is not remotely comparable, as the inquiry undertaken there was far more extensive in scope than what is required here. Further, the defendant-employer, Tech Mahindra, advanced numerous applicable exemption defenses that were supported by the record, including "Computer Employee Exemption … the Administrative Employee Exemption … and the so-called Combination Exemption." *Kumar* at 6.

24

Similarly, Defendant's citation to *Benedict v. Hewlett-Packard Co.* does little to bolster their argument. The *Benedict* case involved a nationwide class action pursuant to Fed. R. Civ. P. 23 comprised of "TSC I, TSC II, TSC III, or FTSC … [which] come from different business organizations within HP." *Benedict v. Hewlett-Packard Co.*, No. 13-CV-00119-BLF, 2016 WL 3742342, at *3 (N.D. Cal. July 13, 2016). Further, the *Benedict* court found that TSC's were "distinguishable from their division into Is, IIs, and IIIs, and "titles" or "roles," which differ from the "TSC" Job Title" and that TSCs and FTSCs further varied "by product, manager and location" *Id*. at 3, 6. Moreover, the plaintiffs in *Benedict* conceded that individualized defenses existed. *Id*. Certainly, these circumstances do not exist here.

Defendant's use of *Dailey v. Groupon, Inc.* is also inapposite, as the Account Reps in *Dailey* were, importantly, subject to performance and evaluations metrics that "varied amongst Account Reps" because Groupon gave its Managers authority to create their own performance metrics from team to team. *Dailey v. Groupon Inc.*, No. 11-C-05685 at 8. Here, as has been evidenced by Plaintiffs' Master Declaration, and described by current PSM Ms. Nieves, all PSMs from all stores were evaluated on the identical set of metrics. Job description, performance standards and duties were implemented across all stores within the Northern District of Illinois such that there is no geographical disparity as existed in *Dailey*.

Similarly, *Bradford v. CVS Pharmacy, Inc.* contains numerous factual circumstances that substantially differentiate it from the facts in this case. There, plaintiffs, all Regional Loss Prevention Managers ("RLPM"), had varying degrees of management responsibility as to CVS' "market investigators", such that some of the plaintiff RLPMs managed entire market investigation programs across an entire region (including hiring, firing, training, evaluating), while other RLPMs had no market investigators "within [their] span of

control", while a another RLPM split the difference and managed three or four market investigators that were "all within his span of control" *Bradford v. CVS Pharmacy, Inc.*, 308 F.R.D. 696, 699 (N.D. Ga. 2015). The differences in responsibility and job duties across RLPM's in *Bradford* were so extreme that some plaintiffs managed scores of subordinate employees while also running the entire division, while others did not have a single subordinate employee within their control. These differences within the RLPM class were certainly distinct and presented proper circumstances for decertification, but no such extremes can be found across this PSM class. In sum, Defendant has attempted to attenuate the facts and circumstances of numerous decertification opinions across the federal circuits to support decertification. But as explained, each of the above cases present substantially different settings that do not align with and are not applicable to the evaluation of the similarity, near identicality, of these PSMs.

Finally, a well-reasoned opinion in this district from the Honorable Amy J. St. Eve offers a relevant discussion of circumstances that are too much for the collective action process and helps illustrate why this case, on the opposite end of the spectrum, is appropriate for the same. In *Camilotes v. Resurrection Health Care Corp.,* 286 F.R.D. 339 (N.D.Ill. 2012), the Court considered a collective action of non-exempt staff nurses employed by Defendant, alleging violation of their meal break time. In a long opinion, Judge St. Eve analyzed various relevant factors that weighed against FLSA certification, including: 1) 217 opt-ins 2) that worked in 198 different departments 3) with 200 different supervisors 4) all working different shifts with 5) with meal break protocols that were not unified as between departments, and 6) different protocol as between departments for reporting missed meal breaks. Comparing the factors in *Camilotes* to the factors here, both

26

ends of the spectrum in terms of FLSA certification are illustrated and this case is a classic candidate for certification. See generally, *Camilotes*, 286 F.R.D. 339.

It is interesting, and highly inconsistent, that Defendant concludes its argument in support of decertification by saying "[e]vidence of what [one PSM] did is not evidence of what [a second PSM] did; evidence of what [a second PSM] did is not evidence of what [a third PSM] does" when, in contrast, Defendant's entire basis for decertification is exactly that – to foist the limited, cherry-picked, non-substantive nuances of a handful of PSMs of which they elected to depose, onto the remainder of the PSM class. Defendant's strategy is transparent. In their Memorandum in Support, Defendant identifies one, single PSM out of a class of 26, who stated she did not perform non-PSM duties (Dolores Garcia, which even so, as explained *supra*, was not an accurate or proper representation of Garcia's testimony) as a basis to break up the entire class. Defendant's attempts to redirect attention and move the goalposts in this regard are flimsy and manufactured and should be summarily rejected.

## VIII.   <u>CONCLUSION</u>

For the reasons stated above, Defendant's Motion for Decertification should be denied and this case set for trial at the Court's earliest convenience.

Respectfully submitted,

*Electronically Filed 05/24/2021*

<u>s/ John W. Billhorn</u>
John W. Billhorn

John W. Billhorn
Samuel D. Engelson
*Attorneys for Plaintiffs and the Plaintiff Class*
BILLHORN LAW FIRM
53 W. Jackson Blvd., Suite 401
Chicago, IL 60604
(312) 853-1450

27